# THE PARLIAMENT OF THE PRUDENT PATRICIANS OF POMPEII

*v.*

## MARR.

LIFE INSURANCE; BENEFICIAL ASSOCIATIONS; AGENCY; WAIVER; CONTRACTS.

1. Where a by-law of a fraternal beneficial association imposes upon the officers of local councils the duty of receiving and transmitting to the central governing body, all the dues, assessments, etc., of the members, a provision in such by-law that the officers of each local council shall be deemed by the agents solely of such council and its members, is inconsistent with the duty and agency imposed upon them by the central governing body, and cannot be used to defeat a claim upon a certificate of insurance issued by the association.

2. Nor can such a claim be defeated by the fact that the assessment due from the decedent was never sent by his local council to the central governing body before his death, it being immaterial as between the member and the association whether the latter's agents, the officers of the local council, performed their duty of

transmitting the assessments or not; nor is it material that the local council was suspended after failure to make punctual remittance of assessments.

3. Where a certificate of insurance has been issued to a member of a local council of a fraternal beneficial association after the time when by the laws of the association such council has forfeited its right to affiliate with the association and the officers thereof have ceased to be the agents of the central governing body, without notice to the insured of the default, such issuance amounts to a waiver, by the association, of the default of the local council and estops the association to deny the continued membership of the council and the agency of its officers.

4. Dates, although given under a *videlicet* in a pleading, must be taken to be correct upon a hearing of a demurrer to such pleading, especially where the pleader announces that he will stand by them, and upon the demurrer being sustained does not elect to amend.

5. While there is grave doubt whether a provision in the by-laws of a beneficial association which prohibits the institution of suits against it " in any other way than through the regular channels of the order," could be sustained under any circumstances as a bar to legal proceedings, recourse to the courts to enforce a claim against the association is not precluded by the general provision referred to, where no provision is made for the settlement of that particular class of claims.

6. Although, as a rule, the courts will not interfere to determine a person's " good standing " in a fraternal or other association, when such good standing is based upon morals, religion, etc., yet when it appears that the governing body of a beneficial association has refused to pay a member's policy of insurance on the ground that the member was not in good standing, and that such good standing was based merely upon the payment of dues and that such dues had been paid, the courts will not hesitate to take cognizance of the matter.

No. 1203. Submitted June 6, 1902. Decided June 23, 1902.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia in an action upon a policy of insurance, a demurrer to each of the several pleas of the defendant to the declaration having been sustained, and the defendant having elected to stand by its pleas.                    *Affirmed.*

The COURT in the opinion stated the case as follows:

The appellant, The Parliament of the Prudent Patricians of Pompeii, is a fraternal beneficial association incorporated in this District under the act of Congress of March 3, 1897 (29 Stat. 630). It consists of a central governing body called the parliament, and numerous subordinate bodies or lodges, called councils, scattered throughout the United States. Besides its charter of incorporation, it is governed by by-laws and regulations to which it has given the name of pandects. Its members are known by the high sounding name of patricians; its governing body by the name of parliament; and some of its principal officers by the appellations of premiers and prothonotaries.

By an instrument of writing in the nature of a certificate or policy of insurance, bearing date on July 23, 1900, and delivered on July 28, 1900, the central governing body at Washington, by its premier and prothonotary, recognized one George Marr as a member of Ponce de Leon Lodge or Primary No. 4, of Savannah, in the State of Georgia; and in consideration of his compliance with the pandects of the order, promised to pay to Evelina Marr, his wife, here the appellee, one thousand dollars upon his death and the surrender of the paper, provided he should be in proper standing in the order at the time of his death. The pandects, by which Marr agreed to be bound on thus becoming a member of the association, provided, among other things, for the payment by each member of certain monthly dues to his council, and for the remittance by the purser of each council, in each month and also semi-annually, of a certain share of these dues to the prothonotary of the central parliament, with full reports as to the standing of the members; and also for the suspension of any council in arrears or failing to make reports, and for the reinstatement of such council on specified conditions. On December 2, 1900, Ponce de Leon Council of Savannah was suspended for alleged failure to make due remittances to the central parliament, such failure being

stated by the appellant under a *videlicet* to have extended over six months prior to December 1, 1900.

George Marr died on January 13, 1901; and payment upon the policy of insurance being refused, his widow, the beneficiary named therein, instituted the present suit by filing her declaration at common law in the Supreme Court of the District of Columbia to recover the amount of the policy. It was stated in the declaration that George Marr had complied with all the rules and regulations of the defendant corporation; that he had duly paid all his monthly dues to the time of his death to the authorized agent of the corporation; that he was in proper or good standing at the time of his death; that the defendant corporation had refused to furnish to the plaintiff the authorized blank forms to make proof of the death, as it was its duty to do; and that it refused to pay the amount of the policy of insurance.

The appellant, as defendant, filed four several pleas to the declaration, setting forth in them the various by-laws of the association assumed to have a bearing on the case. The first of these pleas was to the effect that the deceased, George Marr, had been suspended from membership by the suspension of the council to which he belonged, and remained so suspended at the time of his death, and was not then a member of the association in proper standing. The second was to the effect that the officers of the council who received the dues from Marr did not remit such dues to the central body, as was their duty, and that they were the agents of Marr for such purpose; and that by such failure of his agents to pay to the central body Marr himself was in default. The third plea was to the effect that, by the laws of the association, the members bound themselves to submit their demands against it to the determination of certain officers, boards, and tribunals of the association itself. And the fourth plea was substantially to the same effect as the third, only being in greater detail; the purport of both being that by their agreement to the laws of the order, the civil tribunals of the land were excluded from cognizance of the controversies that might arise between the association and its members.

For the proper understanding of the pleas it is necessary to cite the by-laws of the association to which they refer and upon which they are based.   They are the following:

" Sec. 65 (*a*). Every patrician of the association shall have the right to appeal, and in event of death or disability of a patrician, the right of appeal shall be vested in the beneficiary or personal representative.

" Sec. 65 (*b*). The right of appeal shall also be vested with every legislature or council, and all appeals shall lie against the action or decision of any officer or of any legislature or council, but not against that of the parliament, whose action shall be final and conclusive in all cases.

" Sec. 65 (*c*). An aggrieved party failing to take an appeal in the manner and within the time laid down. in the laws, shall be bound by such action or decision and shall have no further recourse.

" Sec. 65 (*d*). All appeals arising in any way in connection with the benefit funds of the order, and with the laws, or from the action or decision of any officer of the parliament (excepting the premier), shall be to the premier of the parliament.   From the premier of the parliament to the cabinet.   From the cabinet to the parliament, whose decision shall be final on all questions."

\*          \*          \*          \*          \*          \*          \*

" Sec. 80. Council officers shall be elected at the last regular meeting in December of each year, after having been nominated at the previous regular meeting, and shall be installed at the first regular meeting in January following, or at a special meeting called for that purpose, when the installation may be public.   Officers shall be chosen by ballot, except where there is only one candidate nominated for an office, when such candidate shall be declared elected by the premier of the council.

" Sec. 81. The officers of a council shall be the agents of its patricians for the conduct of the business of the council, and for the transmission to the prothonotary of the parliament of all dues and assessments, notices, etc., and the parliament shall not be liable for any negligence in any way,

nor be bound by any irregular or illegal action on the part of the council officers, nor will the parliament be liable for the illegal receipt of arrears of assessments from suspended patricians paid them."

\*        \*        \*        \*        \*        \*        \*

" Sec. 104. No patrician shall be entitled to bring any action or other legal proceedings against any council, legislature, the cabinet or parliament, in any other way than through the regular channels of the order, as provided in the laws."

\*        \*        \*        \*        \*        \*.        \*

" Sec. 106. The monthly rates of payments which every benefit patrician shall pay for immediate payment death benefits, according to his or her age, at the date of enrollment, shall be as follows: (Here follows schedule, not necessary to be transcribed) and he or she shall pay the same rate of payments thereafter as long as he or she remains continually in good standing in the association and in this class."

\*        \*        \*        \*        \*        \*        \*

" Sec. 109 (*a*). Every patrician shall pay into the hands of the prothonotary of his or her council, at or before the end of each calendar month, a sum of money not less than the full amount of his or her rating, according to age and amount of benefit (sections 106 and 107) as per his or her certificate.

" Sec. 109 (*b*). In case a benefit patrician does not pay the monthly payment as above by the first day of each month, he or she shall stand suspended and shall not be entitled to any benefits from the council or association unless reinstated as hereinafter provided.

" Sec. 110 (*a*). Every council, through its purser, shall on the first week day of each month, remit to the prothonotary of the parliament, (1) the amount of one payment, or such amount as has been paid by the patricians of his or her council, for the benefit funds of each patrician in good standing; (2) the amount of all arrearages due on each reinstated patrician; (3) the amount of $1 for certificate for each new patrician initiated since last report; (4) and all other fees

for new patricians, etc., also in January and July of each year the *per capita* tax that is due to the parliament.

" Sec. 110 (*b*). In January and July of each year the amount of the payments due to the legislature, shall be remitted to the prothonotary of the legislature.

" Sec. 111 (*a*). The prothonotary of each council shall, on the first week day of each month, make out and transmit to the prothonotary of the parliament a monthly report on the prescribed form, giving the details since last report of those admitted to membership, or have died, or have been suspended, expelled or reinstated, and such other information as the blank form may call for.

" Sec. 111 (*b*). On the first week day in January the prothonotary of each council shall make out and transmit to the prothonotary of the parliament an annual report on the prescribed form, giving a complete record of the patricians in good standing in the council, and such other information as the blank form may call for.

" Sec. 112 (*a*). Any council failing to remit its money or to make reports as per sections 110 and 111, for a period of ten days, may be suspended by the premier of the parliament, but if not suspended and the default continues for twenty days longer, then such council shall stand suspended on the first day of the month following the date when the default occurred, and the prothonotary of the parliament shall immediately notify the premier, prothonotary and purser of such council of its suspension.

" Sec. 112 (*b*). Any council so suspended may reinstate itself at any time within thirty days from the date of suspension by sending the proper reports and making payment of the amounts due, and by each member furnishing a certificate of good health on the prescribed form, but after thirty days, then each member must pass full medical examination at the expense of the council and also be approved by the cabinet."

The pleas also recite what is called " the protective policy petition," executed by George Marr at the time of his application for the policy of insurance, on July 16, 1900, and

which was carried into the contract of insurance.   It is in the following words:

" I hereby declare and warrant that the above are true answers to the foregoing questions, and I hereby agree that these statements, together with those hereinafter made to examining physician in this petition and the laws, known as pandects, of the parliament, phalanx or primary of the Prudent Patricians of Pompeii, now in force or that may be hereafter adopted, shall form the basis of my contract for protective membership.   *   *   *   This petition and the pandects of the order now in force, or that may hereafter be adopted, are made a part of the contract between myself and the parliament, and I for myself and my beneficiary or beneficiaries agree to conform thereto and be governed thereby."

It will be understood that the word *patrician* in these documents means a member of the order; and that the terms council, legislature, parliament, premier, prothonotary, cabinet, · purser, and other similar remarkable designations are indicative of the various constituent bodies and officers of the organization.

To each of these pleas of the defendant the plaintiff interposed a demurrer, and the demurrer was sustained by the court.   The defendant thereupon announced that it would stand by its pleas; and accordingly judgment was rendered against it for the amount claimed in the declaration, with interest.

The defendant appealed to this court.

*Mr. Charles A. Keigwin* for the appellant.

*Mr. Andrew Wilson* and *Mr. Noël W. Barksdale* for the appellee.

Mr. Justice Morris delivered the opinion of the Court:

1. The principal question in this case is that of the validity of section 81 of the by-laws above cited, whereby it was

sought to make the officers of the several councils the agents
of the members thereof for the transmission of dues, assess-
ments, notices, and so forth, to the central governing body,
in such manner as that the failure of these officers to per-
form their duty in the premises should be visited upon the
members of the councils or upon the central body and the
organizations of which the central body is the organ. And
this question, it is admitted on behalf of the appellant, has
already been settled adversely to the contention of the ap-
pellant by the decision of the Supreme Court of the United
States in the precisely similar case of *Knights of Pythias* v.
*Withers,* 177 U. S. 260, in which a similar by-law was held
void, on the ground that it was inconsistent for the central
body to impose the duties of agency upon the officers of the
local councils and at the same time to seek to escape liability
therefor by the mere declaration that these officers should be
regarded solely as the agents of the members of the local
councils. It is unnecessary for us to seek to add anything
to what was said in that case. The decision is conclusive;
it is authoritative, and it is just.

It is sought, however, to distinguish the present case from
that of *Knights of Pythias* v. *Withers* upon several grounds
which seem to us to be wholly unsubstantial and insufficient.

It is said, in the first place, that it does not appear in this
case that the central body has such control over the officers of
the local councils as was assumed to exist in the Withers
case. But we find no difference whatever in this regard.
In both cases alike the officers were chosen by the local coun-
cils, and the central body designated them as the proper and
the only persons by whom remittance was to be made to the
central body. The theory that it was a necessity for the
organization to make the individual members of the local
councils guarantors of the integrity and good conduct of the
officers in the transactions of these latter with the central
body, was urged as earnestly in the Withers case as it is
here; but the theory is founded upon an impossible basis.

It is urged, in the second place, that in the Withers case
the money was actually transmitted to the central body be-

fore the death of the insured, while here it would seem that
the money was never sent. But it is not apparent that this
circumstance should make any difference. If the officers of
the local lodge or council were the agents of the central body
for the transmission of the money, it is of no consequence
to the individual member whether they performed that duty
or not, whether they performed it tardily or not at all.

It is suggested, in the third place, that in the Withers case
the central body had, in effect waived the requirement of
punctual remittance by failure to enforce the rule for sus-
pension, while here there had been prompt suspension of
the delinquent local council. Again, the answer is, that the
individual member, as such, was not concerned with the
arrangements between the central body and their agents in
the local council.

In the fourth and last place it is argued that the policy
of insurance in this case is a contract under the laws of the
State of Georgia, where it is claimed to have been made;
and that under the laws of Georgia such provisions as sec-
tion 81 of the by-laws here mentioned are held to be valid.
As authority for this statement reference is had to the case of
*O'Connell* v. *Supreme Conclave,* 102 Ga. 143. But we do
not find that that case sustains the proposition. What that
case holds, in the language of the opinion itself, is this:

" In reference to the other charge complained of, it is
only necessary to say that, whether the act of an officer of a
subordinate lodge of a given order is, in a particular in-
stance, binding upon the ' Supreme Conclave ' of the same
order, depends upon the relation of the former to the latter,
as defined by its constitution and by-laws and upon what is
therein provided; and this being so, it cannot, in the absence
of necessary information upon these points, be intelligently
determined whether or not the payment of an assessment to
an officer of the subordinate lodge would, in legal contempla-
tion, be a payment to the ' Supreme Conclave.' "

This is a very different proposition from that contended
for by the appellant. No one denies that, in general, the
relation of the central governing body in these organizations

to the subordinate lodges is to be determined by the con-
stitution and by-laws. But constitutions and by-laws can-
not make that agency in fact where no agency exists, and
cannot relieve a principal of the consequences of agency in
fact by failure to call it so.

In the present case, moreover, there is a peculiar condition
of things which should preclude the appellant from setting
up any such defense as it has here set up. If we can take
the first plea of the defense as stating the truth, this lodge or
council in Savannah, of which George Marr was a member,
had actually been suspended, by virtue of the by-laws, from
affiliation with the order from and after July 1, 1900. For
the plea recites that the council had been in default for the
space of six months prior to the first day of December, 1900,
which means that it had been in default since June 1, 1900;
and that it was actually declared on December 1, 1900, by
the premier of the parliament to be suspended. It is true
that these dates are given under a *videlicet;* but, all the
same, they are no less efficacious for the purposes of the
present demurrer, especially as the defendant announced that
it would stand by them, and therefore must be assumed as
intending to make no variation of such dates in the proof.

But section 112 of the by-laws already cited provides that
when any such default has continued for a period of ten
days, the premier of the parliament may suspend the de-
faulting council; and that, if the default still continues for
twenty days longer, then the offending council shall stand
suspended from and after the first day of the following
month. The result is, that, if the Savannah Council became
in default on June 1, 1900, it became suspended by operation
of the by-laws on July 1, 1900, and was not thereafter in
good standing, if the appellant's theory and statement of
facts be assumed to be correct. And yet upwards of three
weeks after this suspension had been consummated, that is,
on July 23, 1900, when the default, if default there was,
must necessarily have become known to the officers of the
central body, these latter, without any protest of any kind,
without any notice to Marr that his council was in default,

a fact which he could not well have ascertained for himself, but of which they had the evidence in their own possession, executed and delivered to him this policy of insurance. If this action of the central body is not to be regarded, as to him, as a waiver of any default that may have occurred before the execution of the policy, it would have to be regarded in the graver light of a gross fraud upon the insured. This, we are sure, was not intended; but the situation necessitates the acceptance of the theory of waiver of the alleged default.

We find no reason to except this case from the ruling of the Supreme Court of the United States in the case of *Knights of Pythias* v. *Withers.*

2. It is sought, however, by the third and fourth pleas to defeat the appellee's claim, on the ground that sections 64 and 104 of the by-laws of the association prohibit the institution of actions or other legal proceedings against any council, legislature, cabinet, or parliament of the order, *" in any other way than through the regular channels of the order,"* and establish an extensive system of appeals within the organization itself. What is meant by the expression, *" The regular channels of the order,"* does not appear; nor, although an extensive system of appeals is provided, is there any mention of any court or officer to whom cognizance is given of claims like that of the appellee. Even if it could be held that in an incorporated association, such as the appellant is, a by-law could be sustained which would prohibit recourse to the ordinary tribunals of law, in regard to which we entertain very grave doubt; and even if in a voluntary, and especially a religious organization, by-laws and regulations for the discouragement of litigation have been upheld, yet most undoubtedly, in order to preclude one from resorting to the ordinary tribunals of the land for the enforcement of purely civil contracts, there must be some express and specific agreement shown for the substitution of some other mode of settlement. No such agreement is shown here; there is no mode pointed out by the pleas for the settlement of claims like that of the appellee *" in the regular channels of the order."* It is not shown that the appellee, or George

Marr, agreed not to have recourse to the courts in cases like the present. He who would oust the courts of the land of their ordinary jurisdiction, must show with specific distinctness what substitute therefor has been established; and it is not shown by the pleas in the present case that any officer or tribunal has been established to pass upon this class of claims.

It was held by the Supreme Court of the United States, in the case of *Insurance Co.* v. *Morse,* 20 Wall. 445, that no man can legally bind himself in advance to forfeit his right of suit on any and all occasions, whenever the case is presented. See also, to the same effect, *Pope Manufacturing Co.* v. *Gormully,* 144 U. S. 224; *Badenfeld* v. *Mass. Assn.,* 154 Mass. 77; *Reed* v. *Wash. Ins. Co.,* 138 Mass. 572; *Mentz* v. *Armenian Fire Ins. Co.,* 79 Pa. St. 478; *Dugan* v. *Thomas,* 79 Maine, 221; *Chosen Friends* v. *Forsinger,* 125 Ind. 52; *German-Amer. Ins. Co.* v. *Etherton,* 25 Neb. 505.

In any aspect, therefore, of this case, we cannot think that the appellee is precluded by any by-law or regulation of the appellant association from having recourse to the courts of the country for the enforcement of the contract of the association with her.

3. In the third place, it is urged that the policy of insurance is void because the deceased George Marr was not in good standing in the order at the time of his death. We think that, in view of what has been said, this contention is wholly untenable. There is no plea to the effect that George Marr was not in good standing at the time of his death, other than the pleas which have already been considered and found insufficient. Courts of law, it is true, will not ordinarily concern themselves with the question of the good standing of members of social, benevolent and religious organizations. Matters of morals, or religion, or dogma, or discipline, or gentlemanly conduct, must be left to these organizations to be settled as best they can in their own way. But good standing, with reference merely to a civil contract, and which depends on the payment of dues to the organization, is a thing of which the civil courts will not

hesitate to take cognizance. When translated into plain English this argument is merely that the policy of insurance is void because the person insured has not paid his dues; and inasmuch as George Marr did pay his dues, the contention is wholly without foundation. It does not alter the case to call the payment of dues by the name of good standing, or to make the failure to pay dues go by the designation of bad standing. It is with things, not with words, that the law is concerned.

We conclude that there was no error in the judgment rendered by the Supreme Court of the District of Columbia in the premises; and that this judgment shall *be affirmed, with costs. And it is so ordered.*